UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDY LYNN WILLMAN,<br><br>  Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br><br>  Defendant. | Case No. 16-cv-07361-JSC<br><br>**ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 16, 17 |

Plaintiff Sandy Lynn Willman brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision by Defendant Carolyn W. Colvin, the Commissioner of the Social Security Administration, denying Plaintiff's application for Supplemental Social Security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, 1383(f). Both parties have consented to the jurisdiction of the undersigned magistrate judge. (Dkt. Nos. 5, 9.) Now pending before the Court is Ms. Willman's motion for summary judgment, and Defendant's cross-motion for summary judgment. (Dkt. Nos. 16, 17.) After carefully considering the parties' submissions, the Court GRANTS in part and DENIES in part Plaintiff's motion, and GRANTS in part and DENIES in part Defendant's cross-motion. The Administrative Law Judge's determination that Plaintiff could perform simple, repetitive tasks and was not limited to one and two-step job instructions was supported by substantial evidence; however, as the ALJ found that Ms. Willman is moderately limited in concentration, persistence or pace the ALJ erred in not including that limitation in her RFC and hypothetical to the vocational expert.

**LEGAL STANDARD**

Plaintiff is considered "disabled" under the Social Security Act if she meets two requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that she is unable to do her previous work and cannot, based on her age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining:

> (1) whether the claimant is "doing substantial gainful activity";
> (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months;
> (3) whether the impairment "meets or equals" one of the listings in the regulations;
> (4) whether, given the claimant's "residual functional capacity," the claimant can still do her "past relevant work"; and
> (5) whether the claimant "can make an adjustment to other work."

*Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL HISTORY

On February 5, 2013, Plaintiff submitted an application for Supplementary Security Income ("SSI") under title XVI of the Social Security Act. (AR 90, 31, 33.) Plaintiff alleged disability since February 5, 2013. (AR 12.) The Commissioner denied the claim on September 26, 2013 and denied reconsideration on January 21, 2014. (AR 90, 104.) Plaintiff then requested a de novo hearing before an Administrative Law Judge (ALJ). (AR 133.) The hearing was held before ALJ Maxine R. Benmour on June 25, 2015. (AR 29-59; 60-89.) The ALJ concluded Plaintiff was not disabled. (AR 9-28.)

Plaintiff then requested that her case be reviewed by the Appeals Council. (AR 708.) One year later, on October 25, 2016, the Appeals Council denied review. (AR 1-6.) This lawsuit in which Plaintiff seeks judicial review of the SSA's disability determination under 42 U.S.C. section 405(g) followed. Now pending before the Court are the parties' cross-motions for summary judgment. (Dkt. No. 16, 17.)

**FACTUAL BACKGROUND**

Plaintiff Sandy Lynn Willman, a California resident, was born on April 5, 1961 and is 56 years old. (AR 153, 91.) Plaintiff has a 9th grade education and never obtained her GED. (AR 229.) She filed her Social Security claim on February 5, 2013. (AR 90, 153, 229.)

From 1980 to 1985, Plaintiff was employed as a housecleaner. (AR 171.) From 1985 through 1988, Plaintiff worked as an office cleaner and earned seven dollars an hour. (*Id*.) In 1989, Plaintiff stopped working due to her depression. (AR 91, 170.) She attempted to work as a dog washer in 2004 but was terminated shortly after her employment. (AR 51.)

In her initial application, Plaintiff alleged disability on the basis of her depression. (AR 90, 91.) She reported memory loss, anxiety attacks, excessive crying, and trouble getting out of bed. (AR 189.) She stated that her depression adversely impacts her ability to work. (*Id*.) At the time of the hearing, Plaintiff was living in her mother's garage. (AR 273, 229.) She moved in with her mother because she was unable to pay her property taxes and lost her home. (*Id*.) Currently, Plaintiff, her son, her son's girlfriend, and their pets reside with Plaintiff's mother. (AR 36.)

**A. Medical and Third Party Evidence:**

Plaintiff suffers from depression, anxiety, and memory loss. (AR 189.) She has trouble concentrating. (*Id*.) Plaintiff cries a lot and has trouble getting out of bed. (AR 189.) In the past, she was able to train horses but can no longer do so. (AR 190.) Plaintiff received medication for her depression. (AR 40.)

The earliest records in the Administrative Record ("AR") date back to 2004 medical notes from Dr. Neil Ehrlich, Plaintiff's Treating Physician. (AR 267.) A discussion of the relevant medical evidence follows:

*1. Plaintiff's Medical history & Evaluations*

Plaintiff underwent multiple medical examinations in support of her application for disability. (AR 265-316.) Medical evidence included medical records from Plaintiff's two treating physicians: Dr. Neil Ehrlich and Dr. Rhonda Berney. (AR 267-299.) Both treating physicians completed a "Mental Residual Functional Capacity Questionnaire." (*Id.*) Two consultative non-treating physicians also evaluated Plaintiff: Dr. Calvin Pon and Dr. Les Kalman.

(AR 274-291.) Upon SSA's request, they both completed a "Physical Residual Functional Capacity (RFC) Assessment" form. (*Id.*) Moreover, SSA's psychological examiners, Dr. F. Mateus and Dr. Phaedra Caruso-Radin, reviewed Plaintiff's file for initial determination and reconsideration. (AR 100, 115.)

        *i.    Treating Physicians*

            *a)    Dr. Neil Ehrlich*

Dr. Neil Ehrlich, a treating physician and psychiatrist, has seen Plaintiff since 2004. (AR 267.) In a note dated June 5, 2013, Dr. Ehrlich described Plaintiff's long history with depression. (*Id.*) Dr. Ehrlich reported that Plaintiff's depression dated back to her teens and worsened after giving birth to her son. (*Id.*) Dr. Ehrlich also reported that Plaintiff tried several anti-depressants "but they had minimal benefit." (*Id.*) He stated that her symptoms included "anhedonia, poor concentration, no motivation, high levels of anxiety, lack of interest in doing anything, hypersomnia, minimal attention to her activities of daily living, and social avoidance." (*Id.*) Dr. Ehrlich diagnosed Plaintiff with "major depression, recurrent, severe, treatment resistant. Prognosis is poor." (*Id.*) He reported that, in the past, Plaintiff drank beer to lift her mood but she stopped doing so in 2004. (*Id.*)

Dr. Ehrlich prescribed Plaintiff three medications: (1) Pristiq at 100 mg a day (2) Abilify at 5 to 10 mg a day; and (3) Hydroxyzine at 25 mg three times a day depending on anxiety levels. (*Id.*) He reported that, despite medication and anti-depressants, Plaintiff's level of functioning continued to decline. (*Id.*) Dr. Ehrlich also noted that Plaintiff has low to average intelligence and never developed work skills. (*Id.*) Consequently, he noted that Plaintiff would have difficulty in any work setting due "to her high anxiety, difficulty concentrating, poor stress tolerance, social withdrawal, and lack of motivation and energy." (AR 268.) Dr. Ehrlich concluded that Plaintiff is "clearly unable to work and this disability has existed for some time and is likely to continue for the foreseeable future." (AR 267, 268.)

On April 10, 2015, Dr. Ehrlich completed a "Mental Residual Functional Capacity Questionnaire." (AR 303.) The form has a checklist and room for comments. (*Id.*) The symptoms Dr. Ehrlich identified in the checklist included: emotional withdrawal or isolation, generalized persistent anxiety, mood disturbance, decreased energy, feelings of guilt and

4

worthlessness. (AR 304.) He also indicated that Plaintiff would be unable to maintain attention for two hour segments, carry out detailed instructions, deal with stress of work, understand and remember detailed instructions, interact with the general public, or maintain social appropriate behavior. (AR 306.)

In the comment section, Dr. Ehrlich wrote that Plaintiff's clinical findings included "depression, anxiety, low stress tolerance, poor coping skills, low self-esteem, lack of motivation." (AR 303.) He also mentioned Plaintiff's below average IQ, an overall score of 38 for Global Functional Assessment (GAF), and that Plaintiff's "depression, anxiety… [and] low self-esteem would interfere [with her work.]" (AR 305.)

### b) Dr. Rhonda Berney

As of March 2015, Plaintiff had seen Dr. Rhonda Berney, a treating physician, for approximately fifteen years. (AR 296.) On December 2, 2008, Plaintiff went to see Dr. Berney for a follow up appointment regarding her "hypertension and depression." (AR 252.) During that visit, Dr. Berney noted that Plaintiff "continued with medication except only taking one Wellbutrin daily" and that Plaintiff's "depression continues but moderately." (*Id*.) On March 23, 2009, Dr. Berney reported that Plaintiff continued to "be somewhat depressed." (AR 253, 254.) Similarly, on June 15, 2009, Dr. Berney reported that Plaintiff "has trouble remembering to take her birth control daily… poor sleep. Continued depressive symptoms, low energy… depression and anxiety not completely controlled." (AR 257.) Finally, on July 21, 2010, Dr. Berney wrote that Plaintiff was "sad appearing," that her "depression [was] inadequately controlled due to lack of affording optimal medication," and that Plaintiff lacked enjoyment in enjoyable activities. (AR 261.)

On March 16, 2015, Dr. Berney completed a "Mental Residual Functional Capacity Questionnaire." (AR 269, 300.) The form is mainly a checklist but also has some questions and room for short commentary. (AR 269.) The symptoms Dr. Berney selected from the checklist included: motor tension, maladaptive patterns of behavior, generalized persistent anxiety, difficulty thinking and concentrating, persistent disturbance of mood, and recurrent panic attacks manifested by sudden unpredictable onset of the intense apprehension. (AR 297.) Moreover, Dr. Berney concluded that Plaintiff is not able to maintain attention for two hour segments, work in

5

proximity to others without being distracted, interact appropriately with the general public, or complete a regular workday without psychological interruptions. (AR 298, 299.) In the note section, Dr. Berney reported that Plaintiff has "decreased concentration and follow through, [and] inattention." (AR 299.)

### ii. Examining Physicians

#### c) Dr. Les Kalman

Dr. Les Kalman, a Consultative Examiner and non-treating physician, conducted a psychological evaluation on July 18, 2013. (AR 93.) Dr. Kalman noted that Plaintiff would be able to work with supervisors or workers, deal with the public, and is able to understand, carry out, and remember simple one and two step tasks, maintain attention, concentration, and memory, and handle stress and pressures associated with daily work activities. (AR 274.) Dr. Kalman noted that Plaintiff does her own shopping, housekeeping, cooking, and hygiene, but cannot manage her own transportation and has no friends. (*Id.*)

In a psychiatric evaluation, Dr. Kalman noted that Plaintiff "tends not to travel because she gets lost and forgets where she is." (AR 272.) He also reported that Plaintiff has been depressed since her teenage years. (*Id.*) Dr. Kalman wrote that, during the examination, Plaintiff "recalled none of three objects at five minutes… She could not do serials... She could not spell the word 'world' backwards. She just kind of gave up and was tearful." (AR 273.) Plaintiff was able to add, subtract, multiply and had average intelligence. (*Id.*) Plaintiff was also able to recall three of the last five presidents. (*Id.*) Finally, Dr. Kalman noted that Plaintiff's abstractions were not intact and that "her insight into her mental illness was poor and her judgment was poor" because Plaintiff said she would throw away a stamped address envelope if she found it on the ground. (AR 273, 274.) Under affective status, Dr. Kalman wrote Plaintiff's mood was depressed, she had suicidal thoughts, and "vegetative signs includ[ing] hypersomnia, decreased attention, concentration and memory." (AR 274.) Dr. Kalman also gave Plaintiff an overall GAF score of 50 and noted that her condition is not expected to "improve significantly within the next 12 months." (AR 275.)

#### d) Dr. Calvin Pon

On August 28, 2013, Dr. Calvin Pon, a physician board certified in orthopedics and

internal medicine, performed a physical examination on Plaintiff. (AR 99, 289.) Prior to the examination, Dr. Pon read and reviewed Plaintiff's initial disability application. (AR 289.) At the time of the examination, Plaintiff was 52 years old. (*Id*.)

Dr. Pon found that Plaintiff had an active range and motion and walked without the need for assistance. (*Id*.) He also reported that Plaintiff sat comfortably during the history taking, was able to rise from her chair and sit normally, and that she had no restrictions when it came to standing or walking. (*Id*.) Dr. Pon noted that Plaintiff is functional on all ranges of movement. (*Id*.) Overall, Dr. Pon concluded that Plaintiff had no functional limitations. (AR 291.)

### iii. Non-Examining Physicians

On July 30, 2013, Dr. Mateus reviewed Plaintiff's medical records and opined that her depression would impact her ability to concentrate, understand, and remember things. (AR 100.) However, Dr. Mateus also noted that Plaintiff is able to remember and understand very simple and short instructions. (*Id.*) On January 13, 2014, Plaintiff's file was reviewed at reconsideration by Dr. Caruso-Radin. (AR 114, 115.) Dr. Caruso-Radin reported that Plaintiff can remember, understand and carry out two-step commands with simple instructions, can focus for up to four hour increments, and is able to complete a usual work day or work week. (*Id.*)

### iv. Third Party Function Report

Kevin Moore, Plaintiff's cousin, submitted a Third Party Questionnaire on April 22, 2013. (AR 210.) Mr. Moore described how Plaintiff's family gave her a hard time and did not understand her depression. (AR 202.) He noted how Plaintiff has had a lot of trouble socializing and trouble with her memory "which affects her understanding and ability to follow instructions." (AR 207.) He also reported that Plaintiff has trouble "remembering important little details" with spoken instructions. (*Id*.) Moreover, he wrote that Plaintiff has trouble getting up in the morning and her anxiety makes it hard for her to focus. (AR 202.) In the comment section, Mr. Moore wrote:
> Even simple instructions she has problems remembering. Forgets thing I've told her. Sometimes within a minute, sometime the only reason she gets out of bed is too feed pet... She seems to get tired out easily doing light chores. Her house is dirty and messy. (AR 209.)

While Plaintiff does take care of her pets, Mr. Moore noted that she sometimes has trouble getting out of bed so her son feeds the dogs. (AR 203.) Finally, he reported that Plaintiff handles stress

very poorly and "gets anxious and/ or depressed" easily. (AR 203, 208.)

**B. The ALJ Hearing:**

On June 25, 2015, Plaintiff appeared with her Representative, Dan McCaskell, at her scheduled hearing before ALJ Maxine Benmour in San Rafael, California. (AR 31.) Plaintiff and Vocational Expert ("VE"), David Dettmer, testified at the hearing. (*Id*.)

*i. Plaintiff's testimony*

Plaintiff's testimony was mostly limited to her work history dating back to the 1980s, her depression, anxiety, medication, and current living conditions. (AR 22-57.) Plaintiff alleged an onset benefit date of January 1, 1989, which was amended, upon the Representative's request, to February 5, 2013. (AR 31, 33.)

At the beginning of the hearing, Plaintiff's Representative directed the ALJ's attention to a potential discrepancy in the record regarding the DDS assessment. (AR 33.) He noted that Dr. Kalman gave Plaintiff a GAF of 50 and reported that Plaintiff could "sustain concentration, pace and persistence up to four hours and not eight." (*Id.*) According to the Representative's interpretation, an individual with a GAF score of 50 could not work for eight hours a day five days a week. (*Id.*) Plaintiff's Representative wanted to ensure that the evaluator, Dr. Kalman, wrote what he meant. (*Id.*)

The ALJ asked Plaintiff some general background questions, primarily about Plaintiff's work and education. (AR 34.) Plaintiff never graduated from high school or earned a GED. (*Id.*) Plaintiff also stated that she does not remember if she had any work experience since 1994. (*Id.*) After further questioning, Plaintiff testified that she worked as a house cleaner for a short period. (AR 33.) She stopped working afterwards because the economy got worse and people were no longer able to afford house cleaners. (*Id.*)

The ALJ then questioned Plaintiff about her depression. (AR 35.) Plaintiff has been depressed for most of her life but her depression worsened after difficult life events. (AR 35, 36.) Initially, Plaintiff had difficulty recalling those events. (*Id.*) Upon further questioning, Plaintiff mentioned her father's death, divorcing her husband, and selling her home and moving in with her mother. (AR 35, 36.) Plaintiff had to sell her home because she was no longer able to pay property taxes. (AR 35.) She could not remember exactly when she sold her home and moved in

with her mother, who has dementia. (AR 36.) Plaintiff was also not able to recall exactly when her father died. (*Id.*) Plaintiff said "I can't tell you for sure. It was a couple of years ago I believe." (*Id.*)

The ALJ then asked Plaintiff about her living arrangements. (AR 36.) Plaintiff lives with her mother, her twenty-two year old son, his girlfriend, and pets. (*Id.*) Neither the son nor his girlfriend help around the house. (AR 38.) Since her mother is sick, Plaintiff cleans the house, mows the lawn, prepares meals, does laundry, and shops for groceries. (AR 36, 37, 47.) Plaintiff's mother is too sick to leave the home, so Plaintiff takes care of her. (AR 38.)

Plaintiff explained that it is unsafe to leave her mother home alone because she poured gasoline in the dog's bowl and cannot properly clean herself. (AR 46.) Her mother needs help showering. (AR 47.) In particular, Plaintiff needs a bathmat to get her mother out of the bathtub. (*Id.*) Dr. Berney visited Plaintiff's mother on a monthly basis for medical check-ups. (AR 37.) Dr. Berney treats both Plaintiff and her mother. (AR 37, 41.) Previously, Plaintiff's mother was Dr. Berney's bookkeeper. (*Id.*) Plaintiff's mother is struggling with her finances and is unable to pay her bills. (AR 38.) In addition to medical care, a volunteer from the Council of Aging has been assisting Plaintiff and her mother with their bills and getting Plaintiff's mother back on MediCal. (*Id.*)

Plaintiff's depression impacts her memory and concentration. (AR 45.) She forgets simple things on a daily basis, including names, dates, places, and difficult life events. (AR 45, 46, 51.) Plaintiff is on medication due to her depression. (AR 39.) Dr. Ehrlich prescribed Plaintiff Effexor over the phone when she got divorced from her husband. (AR 38, 40, 41.) The medication stopped Plaintiff from crying during her divorce. (AR 38, 40.) Plaintiff also self-medicates on Trazadone to help her go to sleep. (AR 39.) Plaintiff initially testified that she has been seeing Dr. Ehrlich for a while, but she couldn't recall exactly when. (AR 40.) After some questioning, Plaintiff testified that she only saw him once over the past year or five years. (*Id.*)

Plaintiff has frequent anxiety attacks. (AR 43.) While she could not initially remember how often, she later said it was typically on a daily basis. (AR 42, 43.) She was even anxious about coming to the hearing. (AR 42.) Plaintiff grits her teeth and takes marijuana to calm down. (AR 43.) She has consumed marijuana for the past couple of years. (*Id.*) Recently it has become

a daily habit in order to help calm her down. (*Id.*) Plaintiff testified that Dr. Berney is aware of the marijuana consumption because Plaintiff got her signature in order to buy it. (AR 44.) Plaintiff spends her days taking care of her mother, walking the dogs, and watching television. (AR 48, 49.)

   *ii.*  *Examination of Plaintiff by the Representative*

  The Representative pointed out Plaintiff's memory problems by reminding her of her earlier testimony about Dr. Ehlrich. (AR 50.) Earlier, Plaintiff testified that she saw Dr. Ehlrich for a couple of years. (*Id.*) The Representative informed her that the letter Dr. Ehlrich wrote dated back to 2004. (*Id.*) Plaintiff responded "I will just have to go along with that." (*Id.*) Plaintiff confirmed that this was an example of her poor memory. (*Id.*) She also testified that she has the "ability to forget the hard stuff." (*Id.*)

  The Representative moved on to remind Plaintiff about the dog washer job that they discussed. (AR 51.) Plaintiff forgot about it and remembered it upon questioning. (*Id.*) Plaintiff worked part-time but did not recall how many days a week she worked. (AR 54.) As a dog washer, Plaintiff was not able to get herself to pull hair out from poodles' ears because she thought they would be in pain. (AR 51.) She also had trouble clipping dogs' nails and digressed to speaking about her experience mistakenly clipping her own dog into bleeding. (AR 52.) While working on the job, one of the dogs bled while Plaintiff was trimming it. (AR 52.) Plaintiff was terminated from her job and believes it was because she did not work fast enough. (AR 53.) The ALJ briefly asked Plaintiff when this occurred. (*Id.*) Plaintiff responded that it was about four or five years around the time of her divorce. (*Id.*) When the Representative asked her if it was around the time she first saw Dr. Ehrlich in 2004 Plaintiff responded "it's not the first time I have seen him, I don't remember why I saw him before that." (*Id.*) Plaintiff confirmed that, this too, was part of her trouble remembering. (AR 54.) Finally, the Representative explained to the ALJ that it sounded like a failed work attempt. (*Id.*) The Representative also noted that there was no record of the dog washer job and that Plaintiff receives $600 a month from spousal support. (AR 55, 57.)

   *iii.*  *Vocational Expert's testimony*

  VE David Dettmer reviewed Plaintiff's file and was present during Plaintiff's testimony.

1 (AR 56-57.) He testified to Plaintiff's vocational history, identified the exertional and skill levels of those jobs, and ultimately provided testimony as to whether Plaintiff could perform the past relevant work. (*Id*.)

The ALJ posed a hypothetical to the VE to determine whether there are existing jobs in the national economy that Plaintiff can perform despite her impairments. (AR 56.) The ALJ stated a hypothetical of someone like Plaintiff with no relevant work experience and who has not been employed in the past fifteen years. (*Id*.) She imposed the following limitations: "no exertional limitations and only limitation is limited to simple repetitive tasks." (*Id*.) The VE responded that "unskilled, light work or… unskilled work" is available such as a mail clerk, fast food worker, or housekeeper. (AR 56.) Then, the ALJ imposed a new restriction on the hypothetical, inquiring whether it would be acceptable if the worker missed three days a month. (AR 57.) The VE responded that it would be unacceptable because that amount is too excessive, especially with entry-level work "where people are easily replaced and productivity and attendance is important." (*Id*.) The VE concluded no jobs would be available. (*Id*.)

**C. ALJ findings:**

In a written decision, the ALJ found that Plaintiff was not disabled under 1614(a)(3)(A) of the Social Security Act ("SSA"), taking into consideration the testimony and evidence, and using the SSA's five-step sequential evaluation process for determining disability. *See* C.F.R. section 404.1520(a).

At step one, the ALJ concluded that because Plaintiff stopped working, she did not engage in substantial gainful activity during the period in question. (AR 14.) At step two, the ALJ concluded that the objective medical evidence demonstrates that Plaintiff's depression and anxiety constitutes a severe impairment. *See* C.F.R. section 416.920(c). (AR 14.) However, the ALJ noted that hypertension was non-severe because it does not impact Plaintiff's ability to work. (*Id*.)

At the third step, the ALJ determined that Plaintiff did not have an impairment or a combination of impairments that meet or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404. Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). (AR 14.) This step is divided into a two part assessment: "paragraph B" and "paragraph C." (AR 15, 16.) The ALJ concluded Plaintiff's conditions did not satisfy "paragraph B" because

11

Plaintiff's medical records failed to demonstrate that her condition impacted at least two of the following: her daily living, social functioning, concentration, or decomposition. (AR 15.) For daily living, the ALJ used Plaintiff's ability to prepare meals, drive, grocery shop, and manage her own finances as evidence that Plaintiff only has mild restrictions. (*Id.*) For social functioning, the ALJ noted that Plaintiff only has mild difficulties because she can get along with others and did not demonstrate "difficulties responding appropriately to questions at the hearing." (*Id.*) For concentration, the ALJ concluded that Plaintiff has no more than "moderate difficulties" because she is able to maintain her own finances, drive, prepare meals, and maintained attention throughout the hearing. (*Id.*) With regards to decomposition, the ALJ found that Plaintiff "experienced no episodes of decomposition" because there was no evidence in the record regarding "acute care or hospitalization related to psychological symptoms. (*Id.*) Because Plaintiff's mental condition does not cause two marked impairments, paragraph B was not satisfied. (*Id.*)

The ALJ also assessed whether Plaintiff satisfied requirements of "paragraph C." (AR 16.) The ALJ concluded that the record did not have any evidence demonstrating repeated decomposition episodes nor did plaintiff demonstrate "complete inability to function independently outside the area of her home." (AR 15.) The ALJ found that Plaintiff's record was devoid of evidence supporting "paragraph C." (*Id.*) Moreover, the ALJ found that Plaintiff is capable of performing "a full range of work at all exertional levels, but that Plaintiff is limited to simple repetitive tasks." (AR 16.)

At step four, after examining the record, the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (AR 17.) The ALJ concluded that the record, objectively, does not support Plaintiff's allegations of limitations and disabling symptoms imposed by her depression. (AR 22.)

To reach this conclusion, the ALJ discredited Plaintiff's testimony and gave great weight to DDS reviewers' assessments. (AR 19, 20.) The ALJ used the contradictions in Plaintiff's testimony to demonstrate lack of credibility. (AR 18.) Moreover, the ALJ noted that Plaintiff has no trouble in her daily life, is independent with her hygiene, and cares for her mother who suffers from dementia. (AR 17.)

In regards to the medical opinion evidence, the ALJ concluded the opinions of the DDS reviewers, Dr. Pon and Dr. Kalman, were fully supported by Plaintiff's medical records. (AR 19, 20.) The ALJ gave limited weight to the medical source statements of Drs. Ehrlich and Berney, Plaintiff's treating physicians, on the basis that there was not sufficient support in the record for their conclusions. (*Id.*) The ALJ noted that Dr. Ehlrich "treated the claimant only intermittently… and does not provide notes to document any recent visits." (AR 19.) The ALJ also pointed to the following inconsistencies in Dr. Ehrlich's report: (1) that Plaintiff has chronic depression but Dr. Ehrlich diagnosis is based upon his limited medical treatment of Plaintiff and (2) Dr. Ehrlich stated that Plaintiff cannot live independently but she lives independently and cares for her mother. (*Id.*) Likewise, the ALJ gave Dr. Berney's opinion limited weight because she "has seen the claimant only for rare office visits" and has not treated Plaintiff for her anxiety and depression for many years. (*Id.*) Moreover, the ALJ pointed out that there appears to be a family/social relationship which suggests that Dr. Berney may not be objective about her opinion. (*Id.*) She also mentioned that that Dr. Berney's assessment of Plaintiff's inattention may be due to her daily use of marijuana. (AR 20.)

The ALJ gave Dr. Kalman's opinion partial weight. She found that his findings that Plaintiff could interact with supervisors and co-workers; deal with the public; understand, remember, and carry out simple one to two step instructions; maintain attention, concentration, and memory; and withstand the stress and pressure associated with daily work activity supports that Plaintiff retains the ability to do simple, repetitive work without further restriction. However, she gave Dr. Kalman's computation of a GAF score of 50 partial weight because it was "inconsistent with the assessed functional limitations." (AR 20.)

At step five, the ALJ considered whether there are other jobs for Plaintiff given her age, educational background, work experience, and residual functional capacity. (AR 22.) After assessing the documents in the record, the ALJ concluded that there were jobs that Plaintiff could obtain. (*Id.*) The ALJ thus concluded that Plaintiff is not disabled. (*Id.*)

## LEGAL STANDARD

Pursuant to 42 U.S.C. § 405(g), the Court has authority to review an ALJ's decision to deny benefits. When exercising this authority, however, the "Social Security Administration's

13

disability determination should be upheld unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007). The Ninth Circuit defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it is "more than a mere scintilla, but may be less than a preponderance." *Molina v. Astrue*, 674 F.3d 1104 (9th Cir. 2012) (internal citations and quotation marks omitted). To determine whether the ALJ's decision is supported by substantial evidence, the reviewing court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Hill v. Astrue,* 698 F.3d 1153, 1159 (9th Cir. 2012) (internal citations and quotation marks omitted); *see also Andrews,* 53 F.3d at 1039 ("To determine whether substantial evidence supports the ALJ's decision, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.")

Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are roles reserved for the ALJ. *See Andrews,* 53 F.3d at 1039. "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue,* 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and quotation marks omitted); *see also Batson v. Comm'r,* 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion."). "The court may not engage in second-guessing." *Tommasetti,* 533 F.3d at 1039. "It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the Commissioner's determination as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, not the Court's, to resolve conflicts in the evidence." *Bertrand v. Astrue,* No. 08–CV–00147–BAK, 2009 WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).

**DISCUSSION**

Plaintiff's challenge is narrow. First, she insists the ALJ erred by finding that Plaintiff had the Residual Functional Capacity (RFC) to perform "simple repetitive tasks" rather than being limited to "simple one and two-step job instructions." Second, she contends the ALJ failed to provide a hypothetical to the VE that includes the moderate limitation in concentration, persistence, or pace.

14

### A. The RFC is Supported by Substantial Evidence

Plaintiff argues that the ALJ erred by rejecting Dr. Kalman's limitation of "simple one and two-step job instructions" without providing specific and legitimate reasons for doing so. *See Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The distinction between being able to perform simple repetitive tasks and simple one and two step jobs is important because individuals limited to simple one and two step job instructions arguably cannot perform the Level 2 work the ALJ found Plaintiff could perform. *See Rounds v. Comm'r, Soc. Sec. Admin.*, 807 F.3d 996, 1003 (9th Cir. 2015).

The flaw in Plaintiff's argument, however, is that it assumes that Dr. Kalman limited Plaintiff to performing work with simple one and two-step job instructions. The record supports a finding that Dr. Kalman did not find that Plaintiff was so limited. Instead, Dr. Kalman found what Plaintiff *could* do:

1) able to interact with supervisors and co-workers;

2) able to deal with the public;

3) able to understand, remember and carry out simple one and two-step job instructions;

4) able to maintain attention, concentration and memory;

5) able to withstand the stress and pressures associated with daily work activities.

(AR 274-75.) Plaintiff's insistence that the fact that Dr. Kalman assessed Plaintiff with the limitation of carrying out simple one two-step job instruction "is evident with the fact that the other limitations were prefaced with 'able to . . .'" (Dkt. No. 16 at 6) does not make sense. All the "limitations," including carrying "out simple one and two-step job instructions," are prefaced by "able to." (AR 274-75.) Dr. Kalman no more found Plaintiff limited to simple one and two-step job instructions than he found Plaintiff limited to being able to interact with supervisors or co-workers or being able to maintain attention, concentration and memory.

The relevant question then is whether substantial evidence supports the ALJ's finding that Plaintiff can perform simple repetitive work. It does. Dr. Kalman's mental-status findings that Ms. Willman could interact with supervisors and co-workers; deal with the public; understand, remember, and carry out simple one to two step instructions; maintain attention,

concentration, and memory; and withstand the stress and pressure associated with daily work activity is consistent with the RFC finding. Further, that Plaintiff lives with and cares full time for her mother who suffers from dementia, and all that such responsibilities involve, are also consistent with the ALJ's finding. Regardless of whether the ALJ could have found otherwise, the record supports the ALJ's RFC finding and thus the ALJ's RFC opinion must be affirmed.

### B. Plaintiff's Limitations in Concentration, Persistence or Pace

The ALJ found that Ms. Willman has moderate limitations in concentration, persistence or pace. (AR 15.) Ms. Willman maintains that the ALJ erred by not posing a hypothetical to the VE that took into account this limitation. The Court agrees.

The ALJ was required to address all of Plaintiff's limitations, including her moderate limitation in concentration, persistence or pace, in the RFC and hypothetical to the vocational expert. *See Magallanes v. Bowen*, F. 2d 747, 756 (9th Cir. 1989); 20 C.F.R. § 416.945; *see also Lubin v. Comm'n of Social Sec. Admin.*, 507 Fed.Appx. 709, 712 (9th Cir. Feb. 8, 2013) ("The ALJ must include all restrictions in the residual functional capacity determination and the hypothetical question posed to the vocational expert, *including moderate limitations in concentration, persistence, or pac.*") (emphasis added). The ALJ, however, failed to do so. (AR 16-22, 56-57.) The Commissioner does not argue otherwise; indeed, the Commissioner's motion does not address the issue at all. (Dkt. No. 17.)

Accordingly, the Commissioner's disability decision must be reversed on this ground.

### C. Scope of Remand

Plaintiff requests the Court to reverse and remand for benefits or, alternatively, remand for further proceedings. (Dkt. No. 16 at 11.) Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). The credit-as-true rule permits, but does not require, the ALJ to award benefits only under certain circumstances. *Leon v. Berryhill*, No. 15-15277, 2017 WL 5150294, at *2 (9th Cir. Nov. 7, 2017).

A court may remand for an immediate award of benefits when "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony

16

or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020. Each part of this three-part standard must be satisfied for the court to remand for an award of benefits, *id.*, and "[i]t is the 'unusual case' that meets this standard." *Williams v. Colvin*, No. 12–CV6179, 2014 WL 957025, at *14 (N.D. Cal. Mar. 6, 2014) (quoting *Benecke*, 379 F.3d at 595). Moreover, if "an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled," a court should remand for further proceedings "even though all conditions of the credit-as-true rule are satisfied." *Garrison*, 759 F.3d at 1021; *see also Treichler*, 775 F.3d at 1106 ("[A] reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony."). However, "an award under this rule is a rare exception, and the rule was intended to deter ALJs from providing boilerplate rejections without analysis." *Leon v. Berryhill*, No. 15-15277, 2017 WL 5150294, at *2 (9th Cir. Nov. 7, 2017). Indeed, "where ... an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency." *Id.* (citing *Treichler*, 775 F.3d at 1105).

Here, Plaintiff cannot be awarded benefits because the first condition—the only relevant condition here—is not satisfied because the record has not been fully developed. In particular, the ALJ erred in not posing a hypothetical to the VE regarding Plaintiff's moderate limitations with concentration, persistence, or pace. Thus, the Court declines to reach the credit-as-true rule and instead remands for further proceedings.

## CONCLUSION

The ALJ's failure to limit Ms. Willman to one to two-step job instructions is supported by substantial evidence; however, the ALJ erred in not presenting a hypothetical to the VE which includes the moderate limitation in concentration, persistence, or pace as found by the ALJ.

The Court has discretion to determine whether to reverse or remand a social security case. *Lewin v. Schweiker,* 654 F.2d 631, 635–36 (9th Cir. 1981); *Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000). "If additional proceedings can remedy defects in the original administrative proceedings," the case should be remanded. *Lewin,* 654 F.2d at 635. Here, remand is warranted because additional proceedings may remedy the defects in the ALJ's analysis.

For the foregoing reasons, Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment is GRANTED in part and DENIED in part. The Court REMANDS this case for further proceedings consistent with this Order.

This Order disposes of Docket Nos. 16 and 17.

**IT IS SO ORDERED.**

Dated: December 1, 2017

JACQUELINE SCOTT CORLEY
United States Magistrate Judge